COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| WARREN E & P, INC., f/k/a PETROLEUM DEVELOPMENT CORPORATION d/b/a PEDECO, INC., WARREN RESOURCES, INC., and OIL TECHNOLOGY FUND 1996 – SERIES D, L. P., | § § § § | No. 08-10-00198-CV  Appeal from the  81st District Court |
| Appellants/Cross-Appellees, | § | of Frio County, Texas |
| v. | § | (TC# 98-02-00039CVF) |
| GOTHAM INSURANCE COMPANY, |  |  |
| Appellee/Cross-Appellant. |  |  |

**O P I N I O N**

This is the third appeal that has arisen from a dispute relating to the payment of insurance proceeds following an oil well blow-out.[1]  The first appeal was resolved in *Gotham Ins. Co. v. Petroleum Development Corp.*, No. 04-01-00375-CV, 2003 WL 21696625 (Tex. App.--San Antonio, July 23, 2003, pet. denied) (mem. op.) (*Gotham I*).  The second appeal was resolved in *Warren E & P, Inc.,f/k/a Petroleum Development Corp. d/b/a Pedeco, Inc., et al. v. Gotham Ins. Co.*, No. 04-05-00186-CV, 2006 WL 1080246 (Tex. App.--San Antonio, April 26, 2006, pet. denied) (mem. op.) (*Gotham II*).  In this third appeal, Warren E & P, Inc., f/k/a Petroleum Development Corporation d/b/a Pedeco, Inc., Warren Resources, Inc., and Oil Technology Fund 1996 -- Series D, L. P., appeal from the trial court's summary judgment in favor of Gotham Insurance Company.  Gotham cross-appeals.  We reverse.

---

[1] The record reflects that the Texas Supreme Court transferred this case from the Fourth Court of Appeals to this Court.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

# BACKGROUND

In April of 1996, Pedeco, Inc., a New Mexico oil and gas concern, decided to operate in Texas and sought assistance from a Texas company, R. W. Dirks Petroleum Engineers, Inc. Pedeco and Dirks entered into a business agreement, under which Dirks agreed to serve as the record operator of Pedeco's Texas wells until Pedeco obtained its official Texas registration. The agreement also charged Dirks with obtaining well-control insurance.

In May of 1996, Dirks obtained from Gotham Insurance Company a $2,000,000 well-control insurance policy. Dirks was the named insured (or "assured") in the policy. Under the terms of the policy, Gotham agreed to:

> [R]eimburse the Assured for actual costs and/or expenses incurred by the Assured [in proportion to the Assured's ownership interest] (a) in regaining or attempting to regain control of any and all well(s) insured hereunder which get(s) out of control . . . and (b) in extinguishing or attempting to extinguish . . . fires . . . which may endanger the well(s) insured hereunder.

The insurance policy also contained a "care, custody, and control" endorsement, under which Gotham agreed to:

> [C]over the Assured's legal or contractual liability as oil lease operator(s) (or Co-Venturer(s) where applicable) [in proportion to the Assured's ownership interest] for physical loss or damage to, or expenses of salvage of, oil field equipment . . . leased or rented by the Assured or in its care, custody and control at the site.

In December of 1996, Pedeco entered into a joint operating agreement ("JOA") with Warren Resources, Inc. ("WRI"), a New York company that solicited investors to create limited partnerships to fund oil well drilling and then acted as the limited partnerships' managing general partner. Also party to the JOA was one of WRI's limited partnerships, Oil Technology Fund 1996 -- Series D, L. P. ("the Fund"). According to Norman Swanton, WRI's chief executive

2

officer, the Fund took "the responsibility to drill the wells," while WRI and Pedeco "agree[d] to supply the tangible equipment and costs on those wells." Among the oil and gas leases listed in the JOA was the Halff-Oppenheimer Well ("H & O Well") in Frio County.

In January of 1997, Dirks asked Gotham to add Pedeco as an additional insured in the well-control insurance policy because, according to Dirks, Pedeco owned a non-operating working interest in 22 of Dirks' wells. Based on that information, Gotham added an endorsement to the policy naming Pedeco as an additional insured. Unlike Dirks and Pedeco, WRI and the Fund did not obtain well-control insurance.

On July 21, 1997, Pedeco filed a drilling permit with the Texas Railroad Commission, listing Pedeco as the operator of record of the H & O Well. On July 27, 1997, the H & O Well blew out and caught fire, destroying Stricker Drilling Company's drilling rig, third-party contractors' equipment, and neighboring landowners' crops and fences. That same day, Gotham received notice of the blow-out and assigned adjusters from Rush Johnson Associates to investigate. Rush Johnson later reported to Gotham that the losses from the blow-out would exceed the policy limits. Rush Johnson also reported to Gotham that Pedeco representatives had advised one of the Rush Johnson adjusters that Pedeco owned a 100 percent working interest in the H & O Well and was operating it at the time of the blow-out. That representation regarding Pedeco's 100 percent working interest was repeated in 1997 in the sworn proofs of loss submitted by Dirks and Pedeco to Gotham. Based on those and other representations, Gotham's attorneys recommended that it pay Pedeco's claims.

To facilitate payment, the parties entered into an escrow agreement, under which Gotham paid the policy benefits into Rush Johnson's escrow account "to be held in escrow for R. W. Dirks

Petroleum Engineers, Inc. and Pedeco, Inc. for payment direct to vendors of adjusted and approved claim amounts."

In March or April of 1998, an adjuster from Rush Johnson advised Gotham's attorneys that Stricker Drilling Company and several third-party contractors had filed a lawsuit ("the Frio County lawsuit") alleging that Pedeco had not acted as a reasonably prudent operator and had used substandard blow-out prevention equipment. After learning of the allegations in the Frio County lawsuit, Gotham commenced an investigation, ultimately stopped payment on Pedeco's unpaid claims, notified Pedeco of its decision, and then, in May of 1999, intervened in the Frio County lawsuit with claims against Pedeco, WRI, and the Fund, seeking equitable restitution of the insurance benefits paid on behalf of Pedeco. Pedeco counterclaimed for breach of contract, bad faith, and violations of the Texas Insurance Code.

Each of the parties moved for summary judgment on each of the claims and counterclaims. The trial court granted summary judgment in favor of Pedeco, WRI, and the Fund on Gotham's reimbursement claim, in favor of Gotham on Pedeco's counterclaims for bad faith and violations of the Texas Insurance Code, and in favor of Pedeco on its counterclaim for breach of contract, rendering judgment in Pedeco's favor for $271,741.88, attorney's fees, and interest. Gotham appealed, and Pedeco cross-appealed. The Fourth Court of Appeals affirmed the trial court's summary judgment in favor of Gotham on Pedeco's counterclaims for bad faith and violations of the Texas Insurance Code, reversed the trial court's summary judgment in all other respects, and remanded the case for further proceedings. The Fourth Court explained its decision, in part, as follows:

> Gotham argues the trial court erred in denying its motion for summary judgment on Pedeco's breach of contract claim and instead granting Pedeco's,

4

because the summary judgment record conclusively establishes that Pedeco did not sustain an actual loss from the blow-out of the H & O Well and therefore was not entitled to recover under the indemnity policy.   We agree.

.   .   .

[The summary judgment evidence conclusively shows that] although Pedeco may have paid blowout costs, the funds were advanced to Pedeco by WRI; and WRI was not reimbursed by Pedeco for any of the funds advanced. Consequently, any loss that Pedeco suffered as a result of the blowout was made good by WRI.

.   .   .

We therefore hold that, because Pedeco did not suffer a "legal loss," it was not entitled to benefits under the well control policy.

.   .   .

Because Pedeco was not entitled to policy benefits, Gotham argues it is entitled to restitution of the policy benefits it paid under an erroneous belief or mistake of fact.   We again agree.

.   .   .

Because the evidence conclusively establishes that Gotham paid Pedeco's claims under the mistaken belief that the claims were covered by the [well-control] indemnity policy, and because there is no evidence tending to establish that restitution would be inequitable, we hold Gotham is entitled to restitution of the benefits paid to Pedeco.   Therefore, the trial court erred in denying Gotham's motion for summary judgment on its restitution claim against Pedeco.

.   .   .

Gotham also argues the trial court erred in denying its motion for summary judgment on its restitution claims against WRI and the Fund, because Gotham's payments extinguished the valid claims of vendors and thereby discharged WRI and the Fund from debts [they] owed under the JOA; consequently, Gotham argues, WRI [and the Fund were] unjustly enriched by Gotham's payments.   We agree.

.   .   .

We affirm the trial court's summary judgment against Pedeco and in favor of Gotham on Pedeco's counterclaims for bad faith and violations of the Texas Insurance Code.   In all other respects, the trial court's judgment is reversed.   We render judgment in favor of Gotham that Pedeco take nothing on its breach of contract counterclaims.   Gotham asks that we render judgment in its favor on its restitution claims as well.   However, it gives no particulars; and the judgment that should have been rendered is not at all obvious.   We therefore exercise our discretion to simply remand Gotham's restitution claims to the trial court for further proceedings consistent with this opinion.

*Gotham I*, 2003 WL 21696625, at *3-*8.

On remand, Gotham filed a "motion to enter final judgment," seeking $1,823,156.27 in

restitution plus interest, and a motion for attorney's fees. The trial court, without receiving additional evidence, granted both of Gotham's motions. Warren E & P, Inc. (f/k/a Pedeco), WRI, and the Fund appealed. The Fourth Court reversed the portion of the trial court's judgment awarding restitution in the amount of $1,823,156.27 plus interest, and remanded the case to the trial court with instructions that it proceed with a new trial on the amount of restitution to be awarded to Gotham. *Gotham II*, 2006 WL 1080246, at *3. In its opinion, the Fourth Court noted that the parties were in dispute as to the amount that Gotham, as opposed to Gotham's underwriters, actually paid in policy benefits. *Id*. at *2. The Fourth Court also reversed the portion of the trial court's judgment awarding attorney's fees to Gotham and rendered judgment that Gotham take nothing in that regard. *Id*. at *3.

On the second remand, Gotham filed a motion for summary judgment on the amount owed in restitution, as did Warren E & P, Inc., WRI, and the Fund. The trial court granted Gotham's motion and denied the motion filed by Warren E & P, Inc., WRI, and the Fund. The trial court's judgment stated in relevant part:

> The court hereby RENDERS judgment for Plaintiff Gotham Insurance Company, and ORDERS that:
> 1. Plaintiff, Gotham Insurance Company, recover damages from Defendants Warren E & P, Inc., f/k/a Petroleum Development Corporation d/b/a Pedeco, Inc., Warren Resources, Inc., and Oil Technology Fund 1996 -- Series D, L. P., in the sum of $1,823,156.27, prejudgment interest on the sum of $1,823,156.27 at the annual rate of 5.00% running from the date Gotham filed suit on May 21, 1999 until the day before judgment is rendered in the sum of $989,497.61, and taxable court costs in the amount of $13,127.32.

### THE ISSUES

In their first issue, Appellants Warren E & P, Inc., WRI, and the Fund argue that the trial court erred in granting Gotham's motion for summary judgment because, contrary to the opinions

6

in *Gotham I* and *Gotham II*, "Texas law [does] not recognize any equitable right to reimbursement for an insurer that fails to obtain a contractual right to reimbursement." Appellants cite *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42 (Tex. 2008), in support of their argument.

Under the law-of-the-case doctrine, a court of appeals is ordinarily bound by its initial decision if, as in this case, there is a subsequent appeal. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). That doctrine is based on public policy and is aimed at putting an end to litigation. *Id*. However, a court of appeals is not bound by its initial decision if there has been a change in the governing law. *City of Dallas v. Jones*, 331 S.W.3d 781, 785 (Tex. App.--Dallas 2010, pet. dism'd).

As we noted above, the Fourth Court, in *Gotham I*, held that Gotham was entitled to equitable restitution from Pedeco, WRI, and the Fund because those three entities were unjustly enriched at Gotham's expense. The Fourth Court considered the rule announced in *TAC v. Matagorda County*, 52 S.W.3d 128 (Tex. 2000), that abolished the equitable right of restitution of insurance companies against their insureds but reasoned that *Matagorda* did not apply to the issues before it. However, in *Gotham I*, the Fourth Court did not have the benefit of the Texas Supreme Court's analysis in *Frank's Casing*, which clarified the holding in *Matagorda* expressly rejecting the remedy of equitable reimbursement and refusing to recognize any exceptions to the rule. The Supreme Court reasoned that distinctions in the facts raised did not alleviate the contractual based concerns that drove the Court's decision in *Matagorda* eliminating an insurer's equitable right to reimbursement. The Court expressly held that an insurer can seek reimbursement only when that right is included in the policy or there is a clear and unequivocal contractual agreement reached to

7

that effect. As a matter of law, an insurer may not seek equitable restitution against an insured for erroneous payment of a non-covered claim if the insurance policy does not provide for such a remedy. *Frank's Casing*, 246 S.W.3d at 45-47. The Court explained that the rights of the parties to the insurance policy must be found in the policy itself, and if the insurer wants the right to reimbursement for erroneous payment of non-covered claims, the insurer must include such a right in the policy, which might yield a lower premium than a policy that does not contain such a right. *Id*. at 46, 50. To recognize an equitable right to reimbursement, where the policy does not provide for that right, would require us to rewrite the parties' contract or add to its language. *Id*. at 50.

In the instant case, Pedeco's policy with Gotham did not provide for a right to reimbursement for payment of non-covered claims. Therefore, Gotham has no right to reimbursement from Warren E & P, Inc. (f/k/a Pedeco) for payment of the non-covered claims in question.

Gotham seeks reimbursement from WRI and the Fund under the theory of unjust enrichment, claiming that Gotham's payments extinguished the valid claims of vendors and thereby discharged WRI and the Fund from debts they owed. Where, as here, the parties to an insurance contract have spelled out their respective remedies and the policy addresses reimbursement issues, equity cannot give Gotham rights of recovery that the parties did not agree to in their contract. *Frank's Casing* restated the bright-line rule disallowing reimbursement on an equitable unjust enrichment theory because insurers are in a superior position to evaluate the risks stemming from a coverage dispute and can expressly allocate that risk by delineating reimbursement rights in their policies. Gotham could have included a clause in the policy that would have provided for credit against loss payments to the insured in any amounts due to Pedeco

8

by third parties not responsible for the loss. Prevailing Texas Supreme Court authority prohibits granting Gotham an equitable right of reimbursement that does not exist in the insurance policy. The Supreme Court has recognized the "'strong public policy in favor of preserving the freedom of contract'" and has warned that courts "'should not by judicial fiat insert non-existent language . . . into parties' agreed-to contracts.'" *Id*. at 51 (quoting *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 n.41 (Tex. 2007)). Therefore, Gotham has no right to reimbursement from WRI and the Fund for unjust enrichment.

Given our disposition of Appellants' first issue, we need not reach their second and third issues or Gotham's cross-issue.

## CONCLUSION

We reverse the judgment of the trial court and render judgment that Gotham take nothing in its claims against Warren E & P, Inc., WRI, and the Fund.

GUADALUPE RIVERA, Justice

April 18, 2012

Before McClure, C.J., Rivera, J., and Antcliff, J.
Antcliff, J., dissenting

## DISSENTING OPINION

In 2003, the San Antonio Court of Appeals held, as a matter of law, that "Gotham is entitled to restitution of the benefits paid to Pedeco." *See Gotham Ins. Co. v. Petroleum Dev. Corp.*, No. 04-01-00375-CV, 2003 WL 21696625, at *7 (Tex. App.--San Antonio July 23, 2003,

9

pet. denied) (mem. op.) (hereafter "*Gotham I*"). The court also held that Gotham is entitled to restitution from WRI and the Fund. *Id.* In 2006, the San Antonio Court re-affirmed these holdings to be the law of the case. *Warren E & P, Inc. v. Gotham Ins. Co.*, No. 04-05-00186-CV, 2006 WL 1080246, at \*2 (Tex. App.--San Antonio April 26, 2006, pet. denied) (mem. op.) (hereafter *Gotham II*) ("*Gotham I* unequivocally held Gotham was entitled to restitution making it the law of the case . . . .").

"Under the law of the case doctrine, a question of law previously decided on appeal governs a case throughout its subsequent stages." *Jones & Gonzalez, P.C. v. Trinh*, 340 S.W.3d 830, 836 (Tex. App.--San Antonio 2011, no pet.). The doctrine applies even when a case is transferred to us from another court of appeals. *See, e.g., Caplinger v. Allstate Ins. Co.*, 140 S.W.3d 927, 929-30 (Tex. App.--Dallas 2004, pet. denied); *see also Thomas v. Collins*, 860 S.W.2d 500, 502 (Tex. App.--Houston [1st Dist.] 1993, writ denied) (treating prior decision of this Court as law of the case). We are required to decide a transferred case in accordance with the precedent of the transferor court, regardless of whether we might have decided the case differently if it had arisen in our own district. *See* TEX. R. APP. P. 41.3. We must follow the transferor court's precedent "unless it appears that the transferor court itself would not be bound by that precedent." *Id.* cmt.

Therefore, the issue before us is whether there is any basis for departing from the San Antonio Court's ruling. My colleagues have concluded that we need not follow *Gotham I* because an intervening decision by the Texas Supreme Court changed the law. Because I disagree with this conclusion, I respectfully dissent.

In *Matagorda*, Matagorda County demanded that its insurer defend and indemnify it

10

against a third-party claim. *Tex. Ass'n of Counties County Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 129 (Tex. 2000). Believing that the claim fell within a policy exclusion, the insurer filed a declaratory judgment action to determine whether the claim was covered. *Id.* The plaintiffs in the underlying suit offered to settle within policy limits, and the County's lawyer determined that the proposed settlement was reasonable and prudent. *Id.* The County, however, refused to contribute any money to the settlement, asserting that the claim was not excluded from coverage and therefore the insurer should pay. *Id.* at 130.

The policy allowed the insurer to settle claims at its own discretion without the County's consent. *Id.* Accordingly, the insurer went forward with the settlement and paid the entire settlement amount. *Id.* But the insurer sent the County a letter in which it reserved its rights to deny coverage and to seek reimbursement of the settlement funds if it prevailed on the coverage issue in the declaratory judgment action. The County did not respond to the letter. *Id.* The insurer then amended its declaratory judgment petition to seek reimbursement of the settlement funds. *Id.* The insurer prevailed on the coverage issue and obtained a judgment for the full amount of the settlement. *Id.*

The Texas Supreme Court concluded that the County's silence in response to the reservation-of-rights letter, combined with its acknowledgement that the settlement was reasonable, did not create an implied contractual reimbursement obligation. *Id.* at 131. The court reached this conclusion by applying ordinary, black-letter contract principles. *See id.* at 131-33.

The court then considered whether the insurer had an equitable right to reimbursement under the quasi-contractual theories of quantum meruit and unjust enrichment. The court held

11

that these theories did not apply "in the circumstances presented." *Id.* at 134. In reaching this conclusion, the court focused on the potential for unfairness to the insured. If the insurer could seek reimbursement under the circumstances presented in the case, the insured would be "forced to choose between rejecting a settlement within policy limits or accepting a possible financial obligation to pay an amount that may be beyond its means, at a time when the insured is most vulnerable." *Id.* at 135. Moreover, the insurer is in the best position to determine whether coverage exists. *Id.* The Supreme Court thus held "that, when coverage is disputed and the insurer is presented with a reasonable settlement demand within policy limits, the insurer may fund the settlement and seek reimbursement only if it obtains the insured's clear and unequivocal consent to the settlement and the insurer's right to seek reimbursement." *Id.*

In *Gotham I*, Pedeco argued that *Matagorda* abolished any extra-contractual right of restitution that an insurer might have had against its insured. *See* 2003 WL 21696625, at *6. The San Antonio Court of Appeals concluded that *Matagorda* was distinguishable because it involved an insurer's suit against its insured for reimbursement of settlement funds paid to a third-party claimant under a reservation of rights after the third party's claim was adjudicated to be excluded from coverage under a comprehensive general liability policy. *Id.* By contrast, the issue presented in this case is "whether an insurer is entitled to restitution from its insured when, *in reliance upon its insured's representations*, it pays an alleged loss that was in fact 'no loss' because it was 'made good' by a third party." *Id.* (emphasis added). We should follow the San Antonio Court's ruling in *Gotham I* unless it was clearly erroneous or a subsequent decision changed the law. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003); *City of Dallas v. Jones*, 331 S.W.3d 781, 785 (Tex. App.--Dallas 2010, pet. dism'd).

Although I have not found a case defining "clearly erroneous" for law-of-the-case purposes, I believe that it must refer to something more than a mere disagreement with the prior decision. We apply the law-of-the-case doctrine to narrow the issues in successive stages of litigation, to achieve uniformity, and to promote judicial economy and efficiency. *Briscoe*, 102 S.W.3d at 716. The doctrine is based on public policy and is aimed at putting an end to litigation. *Id.* It discourages parties from relitigating an issue in the hope of finding a more favorably disposed tribunal. *See LeBlanc v. State*, 826 S.W.2d 640, 644 (Tex. App.--Houston [14th Dist.] 1992, pet. ref'd) ("Without application of this doctrine, appellant would be able to gamble that between two court of appeals' decisions he would have a better chance of obtaining a favorable ruling by one of them.").

In my view, *Gotham I* drew a perfectly reasonable distinction between this case and *Matagorda*. Whereas *Matagorda* involved the settlement of a third-party claim, this case involves a first-party claim. The public policy rationales undergirding *Matagorda* do not apply outside the settlement context.

Moreover, the Texas Supreme Court denied review in both *Gotham I* and *Gotham II*. This demonstrates that, at least as of 2006, the San Antonio Court's interpretation of *Matagorda* was not clearly erroneous.[1] *See Caplinger*, 140 S.W.3d at 930 ("Where the supreme court declines an opportunity to review a court of appeals's opinion, that opinion is not clearly erroneous."); *see also Hurd Enters. v. Bruni*, 828 S.W.2d 101, 106 (Tex. App.--San Antonio 1992, writ denied); *Am. Trading & Prod. Corp. v. Phillips Petroleum Co.*, 449 S.W.2d 794, 801 (Tex. Civ. App.--El Paso 1969, writ ref'd n.r.e.).

---

[1] Indeed, the San Antonio Court in *Gotham I* and *Gotham II* issued memorandum opinions pursuant to Rule 47.4 of the Texas Rules of Appellate Procedure, a clear indication that the Court considered the issues raised "settled" even in light of the Supreme Court's holding in *Matagorda.*

13

In 2008, the Texas Supreme Court issued its final decision in *Frank's Casing*. Like *Matagorda*, *Frank's Casing* again involved settlement of a third-party claim. *See Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 43-45 (Tex. 2008). The Supreme Court noted that, at least in some respects, the two cases had "indistinguishable facts." *Id.* at 51; *see also id.* at 45 (noting that *Matagorda* involved "similar, though not identical, circumstances").

The court reviewed its *Matagorda* holding and declined to overrule it. *See id.* at 45-48. In addition to the public policy rationales discussed in *Matagorda*, the court found other reasons to deny an implied right to reimbursement. As in *Matagorda*, these reasons derive from the unique circumstances surrounding settlement of a third-party claim. If the insurer had a right to reimbursement, defense counsel might face a conflict of interest during settlement discussions. *Id.* at 47. A right to reimbursement would also weaken the insurer's incentive to negotiate a settlement most favorable to the insured. The insurer might seek to limit its litigation expenses by negotiating a quick settlement, all the while knowing that its insured would likely bear the ultimate burden of paying the settlement. *Id.* These concerns "portend significant distrust in the insurer/insured relationship during the settlement process should an equitable reimbursement right be implied." *Id.*

The court next considered the insurers' attempts to distinguish *Matagorda*. The insurers argued that *Matagorda* did not control because the insured sought a settlement demand from the plaintiff and then insisted that the insurers pay it. *Id.* at 50. The insurers further asserted that *Matagorda* was distinguishable because they were excess insurers with no duty to defend. *Id.* The Supreme Court held that these distinctions were irrelevant. *Id.* The court also stated:

"There is an additional reason that the excess underwriters are not entitled to a reimbursement right. That is, '[w]hen a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement.'" *Id.* (quoting *Fortune Prod. Co. v. Conoco*, 52 S.W.3d 671, 684 (Tex. 2000)).

This review of the opinion demonstrates that *Frank's Casing* did not change the law. Presented with virtually identical facts as in *Matagorda*, the court simply adhered to its prior decision. And, again as in *Matagorda*, the court's reasoning demonstrates that it was concerned with potential unfairness to an insured who has an opportunity to settle a third-party claim. These concerns do not apply here. No conflict of interest has been suggested. Unlike the scenarios envisioned in *Matagorda* and *Frank's Casing*, here Gotham was not in a position to take advantage of Pedeco or to settle a claim for an unreasonable amount, knowing that Pedeco would bear the ultimate responsibility. Instead, Pedeco was the party with superior knowledge and Pedeco made representations to Gotham, which were relied upon by Gotham, about its ownership interest and as to which entity was paying the blow-out costs. *See Gotham I*, No. 04-01-00375-CV, 2003 WL 21696625, at *2.

Although *Frank's Casing* indicates that equitable remedies generally cannot supplant or add terms to a contract, it does not preclude all equitable remedies in every situation. The court cited *Fortune Production*, which held, "*Generally speaking*, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, with certain exceptions not relevant here . . . ." 52 S.W.3d at 684 (emphasis added & citations omitted). One well-recognized exception to this general rule is that a party may recover under the equitable theory of restitution for payments made due to a mistake of fact. "It is [a] settled rule of

15

law that an insurance company which makes payment under a policy because of an erroneous belief induced by a mistake of fact that the terms of the insurance contract required such payment is entitled to restitution from the person receiving such payment, unless it has agreed to assume the risk of mistake, or unless there is some reason which makes it inequitable or inexpedient for restitution to be granted." *Int'l Ins. Co. v. Jataine*, 495 S.W.2d 309, 320-21 (Tex. Civ. App.--Corpus Christi 1973, writ ref'd n.r.e.); *accord Community Mut. Ins. Co. v. Owen*, 804 S.W.2d 602, 605 (Tex. App.--Houston [1st Dist.] 1991, writ denied); *Singer v. St. Paul Mercury Ins. Co.*, 478 S.W.2d 579, 583 (Tex. Civ. App.--San Antonio 1972, writ ref'd n.r.e.). The San Antonio Court of Appeals relied on this exception in *Gotham I*, and there is nothing in *Frank's Casing* to suggest that the exception is no longer valid. *See Gotham I*, 2003 WL 21696625, at *6.

As a result of Pedeco's representations, Gotham erroneously believed that Pedeco's claim was covered by the policy. Thus, Gotham made payments under a mistake of fact. By contrast, the insurers in *Frank's Casing* and *Matagorda* made payments under a mistake of law. Unlike Gotham, they did not believe that the claims were covered, but they paid the claims under the assumption that they could obtain reimbursement if they ultimately prevailed on the coverage issues. *See Owen*, 804 S.W.2d at 605 ("A mistake of law means a mistake as to the legal consequences of an assumed state of facts."); *see also Pennell v. United Ins. Co.*, 243 S.W.2d 572, 576 (Tex. 1951) ("There is no suggestion in the record that there was a mistake of fact as to the kind of automobile in which petitioner was riding when injured or any other mistake of fact. The question whether the double indemnity provision of the policy applied to the jeep, the answer to which determined respondent's liability or nonliability for double indemnity, was one of law.").

Finally, even if *Frank's Casing* changed the law as to Gotham's claim against Pedeco, it

16

certainly does not foreclose Gotham's claim for restitution from WRI and the Fund. Neither WRI nor the Fund were parties to the insurance policy. As discussed above, *Frank's Casing* and *Matagorda* were based on the existence of an insurer/insured relationship and on the existence of a contract. Neither of these facts apply to WRI and the Fund.

Because *Frank's Casing* did not change the law as announced in *Matagorda*, I would affirm the judgment of the trial court, and I respectfully dissent.


April 18, 2012      CHRISTOPHER ANTCLIFF, Justice